HELEN E. DREW AND OTHERS, EXECUTORS, SUBSTITUTED FOR CHARLES M. DREW, DECEASED, v. COMMISSIONER OF TAXATION.[1]

June 21, 1946.

Nos. 34,190, 34,191.

[1]Reported in 23 N. W. (2d) 565.

*Gordon Cain,* for taxpayer.

*J. A. A. Burnquist,* Attorney General, and *T. R. Anderson,* Special Assistant Attorney General, for Commissioner of Taxation.

LORING, CHIEF JUSTICE.

Certiorari to the board of tax appeals on cross-petitions of the commissioner of taxation and the taxpayer. The cases were submitted together.

Charles M. Drew owned several interest-bearing bonds at all times during the year 1940. Interest-bearing coupons were attached, and interest in the amount of $5,196 matured during that year. Shortly prior to maturity, Drew donated and delivered the coupons to the Eliza A. Drew Memorial Fund, Inc., a charitable corporation. Drew, since deceased, is represented here by his executors. He continued his ownership of the bonds after the gift of the coupons in 1940, but did not include the $5,196 interest in his 1940 income tax.

At the beginning of 1940, Drew was also the owner of certain lands located in Minnesota which, during the year, were forfeited to the state for nonpayment of taxes. Treating the loss as an

ordinary one, as distinguished from a loss caused by a sale or the exchange of a capital asset, he deducted the full loss of $46,107.47 (cost to him of the lands) in his income tax report.

On September 8, 1944, the commissioner of taxation issued an order restoring the interest on the coupons to Drew's gross income for 1940 and assessed an additional tax thereon on the theory that the interest was income to him. The order also determined that the loss caused by forfeiture of the lands involved was a capital loss rather than an ordinary loss, and hence the $46,107.47 deduction was disallowed and the whole tax recomputed. The $2,000 deduction allowable under capital losses in excess of capital gains had been claimed in regard to other losses.

Drew appealed to the board of tax appeals on both rulings, and it was there determined that the income on the interest-bearing bonds was not chargeable to him, because they had been given by him to the donee during the year before maturity. It was further decided that the loss sustained by Drew from the forfeiture of lands to the state was a loss from the sale or exchange of a capital asset and not an ordinary loss. Writs of certiorari issued from this court on the application of both parties.

The questions for decision are, first, whether the interest coupons given to the donee before maturity constituted income to the donor, and, second, whether forfeiture of the lands for nonpayment of taxes was a loss from a sale or exchange of a capital asset or an ordinary loss.

### INTEREST

■ The federal statute, Revenue Act of 1924 (26 USCA, § 213[a]),[2] (and see, Revenue Act of 1932 [26 USCA, § 22(a)]),

---

[2]"(a) The term 'gross income' includes gains, profits, and income derived from salaries, wages, or compensation for personal service * * * of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits *and income derived from any source whatever.* * * *" (Italics supplied.)

enacted prior to our state income tax act, was apparently followed by our legislature in enacting the state law. It is substantially the same as our act.[3] State v. Stickney, 213 Minn. 89, 91, 5 N. W. (2d) 351, 352. That case stated:

"The language and principles of the state income tax statute were taken from the various federal income tax acts enacted prior thereto since 1918. * * * Where the state statute is the same or substantially the same as the federal act from which it was copied, the prior construction of the federal statute should be deemed controlling by us in construing the state statute."

The argument of the commissioner of taxation that the interest is taxable to the donor's estate is predicated in part upon the interpretation of the federal statute by the Supreme Court in Lucas v. Earl, 281 U. S. 111, 115, 50 S. Ct. 241, 74 L. ed. 731, 733; Burnet v. Leininger, 285 U. S. 136, 52 S. Ct. 345, 76 L. ed. 665; and Helvering v. Horst, 311 U. S. 112, 61 S. Ct. 144, 85 L. ed. 75, 131 A. L. R., 655, 39 B. T. A. (U. S.) 757, 759. In the Horst case, coupons from bonds were detached before maturity and given by the bondholder to his son. In holding that the interest on the coupons was taxable to the donor, who retained the bonds, the court said (311 U. S. 117, 61 S. Ct. 147, 85 L. ed. 78, 131 A. L. R. 658):

"Although the donor here, by the transfer of the coupons, has precluded any possibility of his collecting them himself, he has nevertheless, by his act, procured payment of the interest as a valuable gift to a member of his family. Such a use of his economic gain, the right to receive income, to procure a satisfaction which can be obtained only by the expenditure of money or property,

---

[3]"The term 'gross income' includes every kind of compensation for labor or personal services of every kind from any private or public employment, office, position or services; income derived from the ownership or use of property; gains or profits derived from every kind of disposition of, or every kind of dealings in, property; income derived from the transaction of any trade or business; *and income derived from any source whatever.*" (Italics supplied.) L. 1933, c. 405, § 11, Minn. St. 1941, § 290.01, subd. 20 (Mason St. 1941 Supp. § 2394-11).

would seem to be the enjoyment of the income whether the satisfaction is the purchase of goods at the corner grocery, the payment of his debt there, or such non-material satisfactions as may result from the payment of a campaign or community chest contribution, or a gift to his favorite son. *Even though he never receives the money, he derives money's worth from the disposition of the coupons which he has used as money or money's worth in the procuring of a satisfaction which is procurable only by the expenditure of money or money's worth.* The enjoyment of the economic benefit accruing to him by virtue of his acquisition of the coupons is realized as completely as it would have been if he had collected the interest in dollars and expended them for any of the purposes named. Burnet v. Wells [289 U. S. 670, 53 S. Ct. 761, 77 L. ed. 1439], supra.

"In a real sense he has enjoyed compensation for money loaned or services rendered, and not any the less so because it is his only reward for them. To say that one who has made a gift thus derived from interest or earnings paid to his donee has never enjoyed or realized the fruits of his investment or labor, because he has assigned them instead of collecting them himself and then paying them over to the donee, is to affront common understanding and to deny the facts of common experience. Common understanding and experience are the touchstones for the interpretation of the revenue laws." (Italics supplied.)

The Horst case was decided some seven years after we adopted our state law, and consequently, as an interpretation, it is not controlling on this court within the rule of State v. Stickney, 213 Minn. 89, 5 N. W. (2d) 351, but, in principle, it is not to be distinguished from two cases decided by the Supreme Court prior to our adoption of the similar federal statute. Lucas v. Earl, 281 U. S. 111, 50 S. Ct. 241, 74 L. ed. 731, and Burnet v. Leininger, 285 U. S. 136, 52 S. Ct. 345, 76 L. ed. 665, *supra.* One of these cases was recently cited by the Supreme Court as the basis for its ruling in the Horst case, and the interpretation given the statutes by

these cases is controlling on this court within the rule of the Stickney case, *supra*.

In the Lucas case, a husband assigned half his future salary to his wife. In holding the husband taxable for all the salary, Mr. Justice Holmes said (281 U. S. 115, 50 S. Ct. 241, 74 L. ed. 733):

"\* \* \* the tax could not be escaped by anticipatory arrangements and contracts however skilfully devised to prevent the salary when paid from vesting even for a second in the man who earned it. \* \* \* no distinction can be taken according to the motives leading to the arrangement by which the fruits are attributed to a different tree from that on which they grew."

In Burnet v. Leininger, 285 U. S. 136, 52 S. Ct. 345, 76 L. ed. 665, the husband assigned half the income from his partnership interest to his wife. He was taxed for all on the authority of the Lucas case, *supra*.

In citing the rule of the Lucas case as the basis of the ruling in the Horst case, the United States Supreme Court recently said:

"Since granting certiorari we have held, *following the reasoning of Lucas v. Earl,* supra, that one who is entitled to receive, at a future date, interest or compensation for services and who makes a gift of it by an anticipatory assignment, realizes taxable income quite as much as if he had collected the income and paid it over to the object of his bounty. Helvering v. Horst, 311 U. S. 112, 61 S. Ct. 144, 85 L. ed. 75, 131 A. L. R. 655; Helvering v. Eubank, 311 U. S. 122, 61 S. Ct. 149, 85 L. ed. 81. *Decision in these cases was rested on the principle that the power to dispose of income is the equivalent of ownership of it and that the exercise of the power to procure its payment to another, whether to pay a debt or to make a gift, is within the reach of the statute taxing income 'derived from any source whatever.'"* (Italics supplied.) Harrison v. Schaffner, 312 U. S. 579, 580, 61 S. Ct. 759, 760, 85 L. ed. 1055, 1056. (The subquotation is in the identical language of our state statute, as noted above.)

The taxpayer seeks to have us adopt the rule of Commr. of Corp. & Taxation v. Williston, 315 Mass. 648, at 652, 54 N. E. (2d) 43, 46, 151 A. L. R. 1395, 1400, where the taxpayer assigned interest coupons to his daughter shortly before they matured. In expressly rejecting the rule of the Horst case, the Massachusetts court said:

"* * * This decision is based upon our construction of one of our taxing statutes and the decisions of this court are final upon such matters. * * * We are not bound by the Horst case, though it is entitled to due deference and respect. We are, however, bound by our own decisions, and we cannot bring ourselves to believe that the satisfaction derived by a parent from making a gift to a child can be said to result in a benefit of such nature as to make the parent subject to our income tax. It was said in Bingham v. Commissioner of Corporations & Taxation, 249 Mass. 79, 80-81, 144 N. E. 77, 33 A. L. R. 809, 811, 'It [income] imports an actual gain. It is based upon the practical conception that additional property has come to the taxpayer out of which some contribution is exacted and can be paid for the support of government. Income indicates increase of wealth in hand out of which money may be taken to satisfy the enforced pecuniary contributions levied to help bear the public expenses.' "

The Massachusetts case is distinguishable because of the difference between the tax statutes of Massachusetts and the federal and Minnesota acts. Both the latter acts tax income "derived from any source whatever," while the Massachusetts statute does not have any similar provision. The Massachusetts court said (315 Mass. 651, 54 N. E. (2d) 45, 151 A. L. R. 1399) : "Taxing statutes are to be strictly construed, and if the right to tax is not plainly conferred then such a right is not to be implied, * * *." That the federal statute, and hence our state statute, in taxing income "derived from any source whatever" was intended as the broadest possible exercise of the taxing power is confirmed by Helvering v. Midland Mut. L. Ins. Co. 300 U. S. 216, 57 S. Ct. 423, 81 L. ed. 612, 108 A. L. R. 436; Douglas v. Willcuts, 296 U. S. 1, 9, 56 S. Ct. 59, 62,

80 L. ed. 3, 8, 101 A. L. R. 391, 396; Helvering v. Clifford, 309 U. S. 331, 60 S. Ct. 554, 84 L. ed. 788. Even if there were no interpretation of the federal act prior to the enactment of the similar state statute, the reasoning applied by the Supreme Court to the provisions here under consideration appears sound and compelling. There was an obvious purpose in our state act to exert the full measure of the taxing power upon all income. It is our conclusion that the interest constituted income to the donor in spite of his disposal of the coupons before maturity. As said in Corliss v. Bowers, 281 U. S. 376, 378, 50 S. Ct. 336, 337, 74 L. ed. 916, 918, where a trust was created with the income for life going to the wife of the donor and with the remainder over to his children:

"* * * The income that is subject to a man's unfettered command and that he is free to enjoy at his own option may be taxed to him as his income, whether he sees fit to enjoy it or not."

### CAPITAL LOSSES

■ The Minnesota provision in regard to deductible losses, as amended by Ex. Sess. L. 1937, c. 49, § 15, Minn. St. 1941, § 290.16, subd. 2 (Mason St. 1940 Supp. § 2394-20[b]), is exactly the same as § 117(d) of the Revenue Act of 1934 (26 USCA), and provides as follows:

"Losses from sales or exchanges of capital assets shall be allowed only, to the extent of $2,000 plus the gains from such sales or exchanges. * * *"

The basis of decedent's claim that the forfeiture of the land constitutes an ordinary loss, rather than loss from a sale or exchange of a capital asset, is the opinion of Judge Sanborn in Helvering v. Nebraska B. S. & Lbr. Co. (8 Cir.) (1940) 115 F. (2d) 288, at 290, 291, where in dealing with this problem the court pointed out that:

"* * * Where a transfer of property takes place without the transferor's receiving anything of value for the property transferred, the transaction is not a sale or exchange.

"There can be no doubt that, as used in the Revenue Act, the words 'sales or exchanges' include all voluntary transfers of property made for a valuable consideration. Whether these words include forced sales from which the transferor receives some financial benefit has apparently not as yet been definitely settled. Compare Commissioner v. Electro-Chemical Engraving Co., 2 Cir., 110 F. 2d 614, with Commissioner v. Hammel, 6 Cir., 108 F. 2d 753. It is not necessary, however, to express an opinion upon that question. *We think that Congress, in enacting § 117(d), was dealing with losses from transfers of property where the transferor received some equivalent for the property parted with.*

"* * * *The State pays nothing for lands which it bids in for taxes.* It acquires title to the lands because of the failure of the owner to pay the taxes charged against them. The owner, therefore, receives nothing for his rights in the lands as a result of the tax proceedings. The transfer of title to the State is not only involuntary, but is without any consideration moving to the transferor. If the forfeiture of the lands by the State be regarded as a means of foreclosing a tax lien, it is to be noted that the owner receives no financial benefit in return for his loss of the property. No debt of his is either paid or reduced. As the Board points out in its opinion, the proceeding merely results in an extinguishment of the owner's title." (Italics supplied.)

This case was reversed by the Supreme Court, Helvering v. Nebraska B. S. & Lbr. Co. 312 U. S. 666, 61 S. Ct. 827, 85 L. ed. 1111, on the authority of Electro-Chemical Engraving Co. Inc. v. Commissioner, 311 U. S. 513, 61 S. Ct. 372, 85 L. ed. 308, and Helvering v. Hammel, 311 U. S. 504, 61 S. Ct. 368, 85 L. ed. 303, 131 A. L. R. 1481. These cases both involved losses by mortgage foreclosure. The Supreme Court said in the Hammel case (311 U. S. 507, 61 S. Ct. 369, 85 L. ed. 305, 131 A. L. R. 1481), that "sale" may have many different meanings, as is shown by Webster's New International Dictionary, but the meaning here depends on the purpose with which "it is used in the statute and the legislative history of that use."

The argument advanced in that case was that congress, in passing the 1934 act placing the $2,000 limitation on deductible losses, intended to prevent an evil existing in the former federal statute, in that by selling acquired assets within two years after their acquisition the taxpayer was allowed 100 percent deduction for losses. By choosing the time of selling, taxes on capital gains might be avoided, and therefore counsel argued that the $2,000 limitation was aimed at voluntary transactions which, by proper timing, lessened federal revenues and therefore was not aimed at forced sales, which would not be within the control of the taxpayer. This argument was rejected by the court, and it pointed out that the treatment of gains and losses from sales of capital assets on a different basis from ordinary gains and losses had been a feature of every revenue act since the act of 1921. Each act had defined, as capital losses, "losses from sales or exchanges of capital assets," and the history of the taxing statutes in this respect clearly showed the intent on the part of congress to treat the taxation of gains on a parity with deductibility on losses.

"* * * In submitting the proposed Revenue Act of 1924, the House committee pointed out that the 1921 Act contained no provision for limiting deduction of capital losses where they exceeded the amount of capital gains. H. Rept. No. 179, 68th Cong., 1st Sess., p. 14. This was remedied by providing in § 208(c) that the amount by which the tax is reduced on account of a capital loss shall not exceed 12½% of the capital loss. In commenting on this provision the Committee said, p. 20: 'If the amount by which the tax is to be increased on account of capital gains is limited to 12½% of the capital gain it follows logically that the amount by which the tax is reduced on account of capital losses shall be limited to the 12½% of the loss.'" Helvering v. Hammel, 311 U. S. 509, 61 S. Ct. 371, 85 L. ed. 306, 131 A. L. R. 1481.

Hence, the $2,000 provision in the 1934 act was merely another step in the process of increasing federal revenue by limiting deductions from capital losses and by increasing taxation on capital gains on

a scale graduated to the length of time the asset was held. In concluding, the court, in the Hammel case, said (311 U. S. 510, 61 S. Ct. 371, 85 L. ed. 307, 131 A. L. R. 1481): "Such sales [mortgage foreclosure sales] can equally be taken to establish the loss in the case of capital assets without infringing the declared policy of the statute to treat capital gains and losses on a parity." The elimination of forced sales from this provision would clearly contravene the purposes of the act.

To us the logic of these opinions appears to be sound, and we see no valid basis for a different construction of the Minnesota statute which, as we have said, is identical with the federal act. The taxpayer's argument that personal liability must exist in the forced sale which would show something akin to a passage of consideration in that a debt or part of a debt is satisfied is not persuasive under this construction of the statute based upon the intent of congress, as shown by the legislative history of the act. What congress and the legislature were apparently seeking was a convenient measure of the loss. For this purpose, the forced sale was as effective as a voluntary one. Nor should there be a distinction between a mortgage foreclosure sale and a tax sale because there is no personal liability to pay real estate taxes. When a person buys land he knows that he holds it subject to the tax laws and that he loses it if he does not comply with them. He may pay the taxes and keep the land, or neglect to do so and lose it.

The decision of the board of tax appeals in regard to taxability of the interest coupons is reversed. Its decision in regard to the extent of deductibility of the loss caused by the tax forfeiture sale is affirmed and the case remanded for action in accordance with the views herein expressed.

Reversed on the writ sued out by the commissioner and affirmed on the writ obtained by the taxpayer.